Good morning and welcome to the Ninth Circuit. We will be hearing cases today, all of which are fairly lengthy in the order in which they appear in the calendar. As usual, the appellant may reserve time, but we're not going to keep the time for you. Go ahead. ETHAN BALLOW Good morning, Your Honors. My name is Ethan Ballow, and this morning I speak for Stanley Reczko. I'm going to watch my clock. I'm going to do my best to reserve three, and I'm going to start with the Sixth Amendment issues, if I may, and we'll see how far we can get with any other issues after those two. Before jumping into the Sixth Amendment, I think a discussion of the jury trial question would be helpful, too. Not instead, but also. I want to start, if I may, by just identifying three key facts that are a little more robust than that when we get into our discussion that show truly remarkable this case is and how that affects the constructive denial of the Sixth Amendment challenge we have raised. One, it's plain on the record that there was an open conflict between Mr. Reczko's lawyers. By October 2011, we have Larry Backman accusing Lisa Basis of incompetence, of not doing her work, of not appearing on the case. He claims she's doing so because she's being investigated by the CJA for questionable billing practices, and she has been paid on this case, and she refuses to work if she's not paid on this case. At the same time, within a year, he's making an ex parte application to remove Basis for those same reasons, nonfeasance and nonpayment. At the same time, Ms. Basis is accusing the other lawyer, Lead Counsel Backman, of incompetence, not doing work, not doing any work on the case, and Backman essentially agrees with that, saying she's been primarily responsible. So what's the prejudice? I mean, this case was pending, what, six and a half years before it went to trial? And these events I'm talking about are in 2011 and 2012, but if I may, Judge Tallman, if I can put you off for a minute to get to the prejudice question, I want to identify two other sets of predicate facts. Okay. And I'm actually going to jump to that because I think it's important to address the question. Second, at the same time, we're talking about the 2011-2012 timeframe, three years before trial, there's open conflict between the client and the lawyers. There's been no visits for more than a year. By the end of 2011, Backman refuses to even accept telephone calls, so there's no in-person communication. But the judge at some point says you have to go see him, and he did go see – he tried to see him. Okay. Is that right? That's much later on, but we're talking for a year he goes without counsel. And then he does say that, and then he says not – in August of 2011, this is – August 2011, there's a status conference. He says go see him and meet and confer, but we know from the June 27, 2012 hearing, Backman didn't do that. And Backman admits it on the record. He didn't go meet, confer. He has excuses. Well, other things were going on. There was a competency exam. But he actually – Backman disregarded that directive. And by June of 2013, Judge King says, well, then prepare the defense without any communications with the client. So we know that Judge King has blessed this lack of communication, which we contend is itself grounds for reversal under the Supreme Court case Riggins. But I still want to focus on my prejudice concern. I'm going to get there. This has a long history. It does. Let me give you one more third predicate fact, and I'm going to get right to your issue. The third predicate fact is, as Judge King recognized, and this is at ER 451, Mr. Retchko suffered from a diagnosed personality disorder that made it challenging for him to communicate with others. Personality disorder but not a mental – like a low IQ. That's correct. I mean, are you suggesting that he wasn't competent to represent himself? No, I'm suggesting that, like this court does when it invited me to argue here today, the court system has an obligation to accommodate people with disabilities or challenges. And when you meet a client who's challenging and has a disorder, this isn't intentional. This isn't him trying to ruin it. This is someone with a diagnosed mental problem. But the mental problem is a personality disorder, which is essentially he's a very difficult guy. Oh, absolutely. But that's when you have to accommodate it. And one thing – so – Accommodate – again, I keep hammering on prejudice, and I'm still waiting for an answer. Okay. How did all this hurt him? I mean, he had forever to get this case ready for trial. The only witnesses that he was not allowed to call and he waived them were five witnesses from the Philippines, two of whom told the court that they weren't going to voluntarily testify. So what did he lose? Well, he lost the right to counsel. And it's structural error. The Constitution says when you charge them with a life case, they get a lawyer to help them. Let me ask you something. Yes, Your Honor. So are we now – are we discussing the non-substitution or the FRED issue? Let's – neither. The non-substitution, the first issue we're talking about, the constructive denial. It's our position that no later than October 2011 and running through the forced FREDA colloquy in May 2013, where he went pro se only because he was not being assisted by counsel, he was effectively denied counsel. And we know from Daniels. We know from Walker. We know from – excuse me, there's a third case, Williams, that in those circumstances where there's a conflict, even if the – based on – in Daniels, even if the conflict's based on a client's refusal to meet with counsel, you – that's error and there's an obligation to give a new attorney. And I point to two things that are very important. How many attorneys did he go through? In this case? Yeah. He was trying to get rid of Bases and Backman since two days – he got appointed Backman two days after the indictment. Yeah, but then wasn't there – was there a federal public defender or somebody? There was a public defender that was appointed pre-indictment. Right. The record's murky. That lawyer moved to withdraw. It's unclear whether there was ever any hearing on that where the reticle was present. That's three. And then there was Kalanides. Well, I don't count to three. Backman and Bases were at the same time. Okay. Well, that's two. Kalanides was the one at the end. He was the stand-by guy. Right. And he was happy with Kalanides. He never complained about Kalanides. Okay. So there were at least four lawyers that were at some point involved on the defense of this case over the six-and-a-half year period. Well, Backman and Bases were involved at exactly the same time. So I think it's unfair to count those as two separate lawyers. That was one representation. It was one representation. It was a joint representation. Without regard to how many lawyers can dance on the head of a pin here. Well, I'm here with an associate. How many lawyers does he have here today, Your Honor? Yeah, I think he's got two. Okay, but I'm only unappointed. She's an associate. Does that make a difference? How am I representing him? It seems to me, just a step back, that, you know, this was an extraordinarily difficult situation. There was no doubt that the attorney-client provision entirely broke down. Broke down entirely. The lawyer wanted out. He said he wanted out. Yes. On the other hand, Judge King did appear to go through long and complicated colloquies and considerations and attempts to get the relationship on some kind of a functional basis. And he, moreover, was persuaded that the same thing would happen if he appointed another lawyer. So, go ahead. First of all, yes and no. I agree with long. Look at the June 27, 2012 transcript of the hearing. A major complaint by Retschko, which is what Judge King does is he gets the laundry list. What are all your complaints? And he understands them. It's sort of like the Tony Piazza situation where he makes sure he understands. And then a big complaint is no communications, no phone calls, no visits for more than a year. And he doesn't ask the lawyers about that. He ignores it. So we have this lengthy hearing, Your Honor, but the lengthy hearing doesn't address a core problem. But that wasn't really, I read that transcript. It seemed to me that he was, he had a lot of very specific complaints about a bunch of things, which when inquired into, at least the lawyer said, never happened. The key issue of no communications for over a year denied him counsel, which forced him to go pro se. And the issue under Daniels and what the government focused on is did Stanley Retschko have reasons to distrust his lawyers? They were admonished no less than four times for unprofessional conduct. They were threatened with contempt. They accused each other on the record of abandoning the client. What was the unprofessional conduct? The first one was Ms. Basis asked for a motion, an extension of time, and told the judge if he wouldn't give it to her, she was off the case. The first time, after the October 11th conflict, as opposed to relieve them, he admonished them for being unprofessional and asked them to work together. I can give you some citations. The four admonishments, CR 322, CR 403, that's when there was a blown OSC deadline for Ms. Basis. She just blows it off. There is ER 806. There is CR 409. So he has lawyers who accuse each other of not working on the case, lawyers abandoning him. Backman saying in open court, I hate this guy. I won't sit next to him. I want him shackled. I don't like him. I've never had anyone I hate so much. I want to go off the case so I can be on a hot bench, which ironically enough is a hot bench where they basically pay judges on TV to yell at people. Backman was perfect for it. Backman is constantly filing attorney-client privileged communications without seeking permission. Resco says I don't trust my lawyers. It's fine. Let me finish this one point. I'm still waiting for an answer to my prejudice question. It's structural. Jerry, your honor. King made a factual finding that the bulk of the problem here was of Resco's own creation, and it may very well be because he suffered from an antisocial personality disorder, but we've got a finding by the district court that he is essentially the crux of the problem here. Well, first of all, I don't think he made it exactly as you said, but in any case, under Daniels, it doesn't matter. He's entitled to a lawyer. As we know, Judge King's prognostication would happen years further was wrong. Let's get to the Feretta issue. Isn't that an adequate waiver of the right to counsel if Resco says I can do a better job myself? No, established case law shows if he made that decision because he was abandoned by counsel and saw no other option, that that's effective denial. The Feretta doesn't get him out of that. You say that he got along with the last lawyer, but I don't know how the record shows that. I think the last lawyer was standing by doing nothing until there was a motion about two months before a scheduled trial. And that one, by the way, is the one that most troubles me. Let me say one last thing when we get to that because my time is burning. But then he took over and did the trial. We have no idea whether they got along or not. Well, we know they didn't fight. We know there was no motion. How do we know they didn't fight? It was a four-day trial that he just showed up the first day of. Followed by a sentencing three months later where he got life with no complaints in between. But let me say this last thing on this point. I'm going to pivot to the failure to reappoint. Bachman, though filing attorney-client privileged communications improperly, ultimately does a service to this court. And take a look at those letters. And I think I have a citation for you on them. Bachman's letters and Retschko's letters may be fine. A good catalog is ER 475 to 505. And they may file one after 505. Look at Retschko's letters. These are not abusive. These are not what Bachman claimed they were. These are good letters. They show an intelligent defendant trying to identify what he thinks is important to the case. They're cordial. They're civil. And Bachman, his response to the ones that are aggressive, over the top and caused the conflict. So to the extent there's a factual finding of who caused it, read those letters. It can't be sustained. But by December 2014, when he asked for reappointment because he wanted a reappointment of counsel, that's another error. And it's critical because Retschko didn't ask for a continuance. And I don't understand how David Kalianidis could stand up in court and say, I'm ready to try this case at standby counsel if I'm appointed on a moment's notice and I will be effective under the Sixth Amendment. I just can't be lead counsel now two months ahead of time. I don't understand how those things work. That is the part that troubled me because he was appointed at standby counsel and the understanding that he would step in at any moment. And he didn't want to. And he said at that point, he said, I can't provide Sixth Amendment effective counsel, but I can do it essentially is what he said. And his reasons for not, and I think that's a great point you're on, the reasons why don't make any sense. Well, I can't file pretrial motions because the time is blown and I can't file a motion to eliminate. And that's important for three reasons. One, Retschko doesn't want a continuance. He wants a go time now. So it's not his motion for continuance. And two, when a lawyer comes in and the deadlines were in the past, that's not IAC. That's living with the record. Just as the Fourth Amendment motion had been denied and the Rule 15 motion had been denied, Kalianides couldn't say I'm not ready because I want to relitigate. Which is what happened anyway. Right, exactly. It's in the back door. So there was no good reason not to appoint Kalianides. He was supposed to be ready and he should have been appointed. And that right there is also, it's a structural error that requires reversal. I want to, unless you have questions on that, I do want to address the 3559 issue, the jury waiver issue. There's no presumption of correctness because it was oral. Cochran sets forth four factors that you have to give, especially if you have any client who has demonstrated mental or emotional instability. Well, I don't think it doesn't say you have to give him. Well, Shorty says there was error because the court didn't go over all four. So I take Shorty, so it follows from Shorty that if Cochran let out the factors and then you get a reversal because the court didn't follow and examine the Cochran factors and that caused a reversal for an incomplete colloquy, then it follows from Shorty that you have to give the Cochran factors. Now, we're only talking about a jury trial on essentially the priors and the registration. That is correct. Okay, go ahead. Well, if the court has questions, I'll answer them. I think that's the nature of the argument. It was just insufficient. And I think also what buttresses that is after he made that waiver, there was a new indictment re-entered. There was an arraignment. He was arraigned. He was confirmed that he was on FREDA status, but there was no further jury trial taken. And the purpose of an arraignment is to inform the client of their rights. But wasn't the strategy to prevent the jury who was hearing count one from learning that he'd been previously convicted of sexually molesting his minor daughter? To me, that is a perfectly rational reason for waiving a jury trial on count two. Every waiver has a rational reason behind it. The obligated requisite warnings to obtain a knowing and voluntary waiver are different than whether there's good reasons for it, which is why Cochran holds what it holds. Because every time there's a waiver of any right, you plead guilty, there's a reason. You're afraid of the trial penalty, so you plead guilty. That doesn't get out of Rule 11. Maybe I'm too hung up on prejudice, but I just don't see the prejudice to RESCO in waiving a jury on the count two offense. Let me ask you something. It's a structural error that requires showing a prejudice. Okay, but if we were to credit this, presumably he could have – he'd have a jury trial on those two things only, right? If he did not sustain the other – Right. Does he really want that? Well, that was my question. Well, he's serving a life sentence now, Your Honor. So, yes, he would like a chance not to do that. I'm going to reserve the rest. Okay, thank you very much. Good morning, Your Honors. May it please the Court. Ashley Aul for the United States. Defendant's argument on the Sixth Amendment proceeds from, in my estimation, three errors. One is about what the standard is. The standard is, did the district court abuse its discretion, both with respect to any request for a substitution, and then later with respect to a request for a continuance to have Culley– But there are instances, including relatively recent opinions, in which despite the fact that it is clear that there was a total breakdown, that – despite the fact that the defendant may well have had been the reason for the breakdown, we have nonetheless said that there were inadequate investigations and that there was an abuse of discretion, right? And this case seems on the far end of both breakdown and animosity between the lawyer and the client and between the lawyers, which is an unusual factor that I haven't seen before. So it just seems extreme, even if the frustration with the defendant is totally understandable. And the question is, what do we do with that? Yeah, I actually – I don't disagree that this case is extreme in various respects. But the difference between this case and the cases you just identified is in all of those cases – Velazquez, Brown, Williams, Shell, Walker – this court found that there was an inadequate investigation by the district court. And the investigation and the findings of the district court here were extremely lengthy. Frankly, my notes of all the pretrial history are 24 single-spaced pages long. And Judge King's patience and his diligence are really extraordinary throughout the proceedings. And so with respect to the substitution requests, both the hearings and the findings on defendant substitution requests are extremely detailed and full of factual findings that put this case squarely in the category of cases where this court has held that there are limits on the ability of a defendant to gain new counsel when the defendant is acting unreasonably. But what about the fact that it does appear that he had no communication with counsel for well over a year at one point, that the two lawyers are accusing each other of incompetence and malicious activity, basically? So I would separate those into two different buckets. I mean, ultimately, on the gaps in communication, I believe they're much shorter than the defendant just articulated here today. I can't remember the exact timeline. But Backman disputed many of the assertions about failure to communicate with the defendant. And there was much more communication than had been alleged in the defendant's own motions. But ultimately, the inquiry under Rivera-Corona is the adequacy of the district court's inquiry, which of course here was more than adequate. I think it's frankly the most diligent record I could imagine. Two, the extent of the conflict. And three, timeliness, which we won't talk about for the moment. On the extent of the conflict, the disputes between defendants' counsel as they are throwing accusations at each other, I'm not sure go to this claim at all. They certainly would go to a claim of ineffective assistance. But that's not what the claim here is today. The claim here today was defendants' request for substitution when they were ultimately made. And what was his conflict, the extent of his conflict with his counsel and what the source of that conflict was. Disputes about whether or not Bassus was being paid by CJA or capable of meeting deadlines don't go to that. Now, they may go to her effectiveness under the Sixth Amendment. But that's not the same claim. The claim is about the breakdown in defendants' communication. And was that breakdown so dire that it resulted in the deprivation of assistance of counsel? And the answer to that is simply that it didn't. One, the district court found repeatedly the defendant was the cause of it. And I would note that not only Judge King but also Dr. Fairstein concluded that he would do this with any counsel. So it wasn't just the court making assumptions. This was a finding by a psychiatrist. That's at GER 127. It's referenced Fairstein's finding. And then the courts at 423 to 24. So you have a defendant that was never going to be satisfied with counsel, ever. And was generating these disputes in order to accomplish what he ultimately succeeded in accomplishing, which was an extraordinary delay before trial. So there is some suggestion that he was happy with his final counsel that tried. Can you address some of that? Is that not accurate? I agree with Judge Berzon that the record just isn't developed. Between the point at which the defendant was allowed to go pro se after begging for it for years and when he ultimately had standby counsel come in at trial, standby counsel was ordered not to be involved because he was not supposed to be a supervisor, he was supposed to be an emergency counsel. But he was supposed to keep up with everything going on and be ready to step in at a moment's notice. That's correct. And then when he was asked to step in, he said he couldn't step in. And I don't understand. As I said before, this is the piece that troubles me the most because the reason you had this person was precisely that he could step in. And, in fact, he did eventually step in. So I don't really understand why the district court didn't just say, sorry, you have to come in. Under the circumstances, Your Honor, I understand that concern. I don't think there was any abuse of discretion by Judge King. And I would say, to be honest, this case falls squarely within the cases about reappointment of counsel. Looking at the facts of those cases, they involve very similar, very difficult defendants. Frankly, I think this defendant is perhaps the most difficult of any that those cases analyze. But they analyze very similar factual scenarios, where there was just a mess of pretrial litigation over the issue of counsel, ultimately resulting in some request for continuity. But did they have an appointed standby counsel whose job was exactly to do this? I can't remember. I don't think so. I mean, that's why this is so bizarre, because at the point at which he – the judge didn't say that he wouldn't otherwise have appointed the counsel. So I don't think it changes what the standard is, which is whether or not there was an abuse of discretion by the district court. But that usually requires looking at what he actually said. And what he actually said was, I'm not going to do it because it's going to delay the trial. He didn't say, I'm not going to do it because I don't think it's otherwise merited. I don't think that's an accurate recitation of the order. This order was actually the most detailed by the district court. And it gets into a specific discussion of, among other things, this is ER 287 to 293, of the defendant's dilatory conduct. That's a 292 to 293. Yes, but that assumes it's dilatory. And if he had simply said, I'm not giving you a delay, but I am substituting the counsel, the dilatory would have had nothing to do with it. I don't know that I agree with that, particularly given, frankly, the record as it unfolded after that point. Defendant's dilatory conduct became the most amplified right before the trial. And his goal was not just to get counsel or not. His goal was to delay the trial. That may have been, but it doesn't mean you have to accommodate that. But on the other hand, I mean, as it turned out, he had a lawyer who had absolutely no preparation. If he had been appointed two months before, he would have had two months. So that's not quite accurate either. What happened was at the point at which the court denied this motion, things got more and more amplified in terms of the defendant's misbehavior. And at some point, the district court did order standby counsel to be ready, noting that defendants seemed to be on course to be waiving his right to represent himself because he was refusing to communicate. He didn't participate in a big motion to suppress a couple weeks before trial. And then the standby counsel was put on notice, you may have to take the baton. And then he did, and frankly, he did a spectacular job. He did a very good job at trial. His closing argument, I would point the court to in particular, raised a highly technical and very good defense about whether or not we could prove intent to bring the child pornography to the United States. It was an excellent defense. The defendant ultimately got very good counsel at trial and much better counsel than he would have had had he continued to represent himself. But at bottom, and I understand the court's concerns about the timeline, I don't think there's any way to get around the fact that Judge King simply did not abuse his discretion. The record of his patience and care is extraordinary at every point in this trial. And to be honest, I would, and defendant's difficulty can also not be underestimated. In the hearing in which Judge King denied defendant his request to have counsel reappointed, and before he made these findings about how this would be an endless cycle and the justice system cannot be at defendant's mercy, defendant interrupted him and said, quote, you're going to suffer for every decision you've made. That's at GER 689. This court cannot let defendant be right about that. Judge King did everything within his power. When was that, by the way? Pardon me? When was that? That's December of 2014. Or maybe it's January 2015, right before trial, GER 689. And in any case, this case frankly looks just like Turner, the case on which I submitted a 28J letter. And under circumstances like this, this court has found far more than that a district court didn't abuse its discretion in denying a continuance or a request for counsel. This court has held that a defendant waived his Sixth Amendment rights with behavior like this. That's what Turner held. And certainly, if it can be the case that behavior like this is an outright waiver of Sixth Amendment rights, it cannot be the case that Judge King here abused his discretion by refusing substitution requests and ultimately denying his request to get new counsel right before trial. Can I ask about the – not to move you on, but the waiver of the trial by jury on the 3559 enhancements. Is the government's position that the district court did do a proper colloquy or just that it was – is there an acknowledgment of some deficiency? I would acknowledge that the district court did not hit all four Cochran factors. In my view, it hit two. It hit that there are 12 members of the jury. That's at ER 106. And that if you waive jury, the court decides. That's also at ER 106. There is not a reference to defendants taking part in jury selection or unanimity on the record. But I don't think that all four of those – What was the second one? I'm sorry. The requirement of unanimity and defendant's ability to pick a jury. So that said, the ultimate inquiry is whether or not this was a voluntary, knowing, and intelligent waiver. Those factors bear upon that, but they can't be the exclusive factors because ultimately it's a much broader standard. And the – But the problem here, there are other factors running around. First, he had refused to waive the jury several times before the waiver, right? I don't know that that's true, Your Honor. Yeah, he did. I'll take your assertion if that's true. And at least twice, I think. Okay. And there's an order to that effect saying, okay, we're not going to do this anymore. He's not – he doesn't want to waive it. And second of all, there's the factor of whatever his – that he'd been through several competency hearings suggesting that there was a heightened concern. And third and fourth, maybe the two other things, I don't really understand why the district judges don't insist on a written waiver because then they get over all this. And fourthly, the – this was at the period when the waiver actually occurred, was in the middle of all the conflict with the lawyer, right? And it was the lawyer who did the waiver. So timeline-wise, this happened after Judge King had ordered them to keep working together. However, at the actual hearing, what counsel said is that we've talked about this at length. Defendant himself asserted that he agreed and that they had talked about it and that he didn't need more advice. Even at one point in the colloquy, he actually takes a moment to talk to his lawyer to get advice before continuing. And at bottom, this colloquy was very long. It's actually over 40 pages long. It kind of comes in and out. But it looks nothing like the colloquies that were found deficient and that I think I would agree were deficient from Cochran, Christiansen, and Shorey. The other factor is that there's no – really no point to having a jury trial. Correct. There's no point – there's not just no point. There is an overwhelming strategic reason not to that was stated on the record during the colloquy. It's not just that we can guess that this was harmless because there obviously was this strategic reason. They talked about it. During the colloquy, Judge King and the defendant talked about how the reason for doing this was to keep information the defendant had raped his daughter and was a registered sex offender away from the jury. In a context like that, frankly, this looks like old chief, right, in the same way that a defendant has some leeway in making the government accept a jury waiver for certain things that are highly prejudicial like a prior felony. This, like a prior felony, would have been overwhelmingly prejudicial, and defendant had every reason to waive jury trial. And to be honest, it's a very narrow set of issues on which he was waiving. It was simply, was he registered as a sex offender? And then with respect to 3559, it's really only one fact, which is that the victim was a child. That it was a sex offense is a categorical question, but under DOST there is the fact of whether the victim was a child. So the question is, did you rape a child before you did this, and are you a registered sex offender? Those facts were not only within the district court's discretion to accept a jury trial. That's going to take five minutes because there's nothing really to contest. Correct, Your Honor. Correct, Your Honor. I don't think there was any defense to those decisions. But that sort of cuts both ways, I mean, in the sense that if we were to order a jury trial, it wouldn't be a big deal anyway. I think there is no chance that a jury trial would happen. A defendant has no interest in a jury having this kind of information, which is what was discussed during his colloquy. Well, but you see, if he did it now, he would probably be able to do it without doing the whole thing over again. Correct, Your Honor. But there really is no reason, there is simply no reason to do that. And, again, I would point the court to the 40-page off-and-on colloquy. It really does look, if this had been a seven-question colloquy like in Shorty or a five-question colloquy, this argument would be very different. But there is no doubt that during that colloquy, the defendant was very aware of what was going on. And, in fact— It's just the kind of case, it's an issue that's very frustrating because all the judge had to do was dot some i's and cross some t's, and we wouldn't be here. To be honest, in this context, that's not quite true, Your Honor, because the holding of Christensen is actually that when there's something in the record that calls a defendant's emotional state into question, you need a colloquy anyway. That's what Christensen holds. Okay. And you're supposed to go through four things, and all he had to do was go through the four things, and he didn't do it. So, again, I don't think those four things are mandatory. And I agree that I think they were substantially but not entirely complied with here. There was simply no question the defendant's waiver was voluntary, knowing, and intelligent. And one citation that I don't think was emphasized in the brief is that GER 478 to 79, during this colloquy later, Judge King specifically finds that the defendant had been very calm, paying attention, very rational during that very hearing, and there is simply no basis to find error. Do you want to address the for the purpose of issue?  Yes, very briefly, Your Honor. Burrage simply does not apply to mens rea standards. For the purpose of is a mens rea standard. Well, but that piece doesn't work for me for the following reason. This set of case law sort of sits on top of the Title VII and other employment discrimination cases, right? And those are mens rea cases, right? It's a case where you're supposed to do something because of somebody's sex or race or whatever, and that is a state-of-mind question. And nonetheless, the causation issue is being applied. So I don't think that's the distinction. This Court has adopted that in Backman. Backman held that this did not apply to a mens rea standard. We were wrong, or facile, because, in fact, the same causation problem arises in the whole line of cases from which this comes, and those are state-of-mind cases. Going back to Mount Healthy, where it's a First Amendment issue, those are all issues about why somebody was doing something. So I have a grammatical retort, which is not in the brief, which is that defendant has actually argued the grammatical logic exactly backwards. Let's assume we replaced for the purpose of with resulting in in the statute that would result in a statute that made it criminal to engage in sexually explicit conduct resulting in the production of any visual depiction. Defendant has put that backwards. He has said that the sexual conduct, pardon me, that the visual depiction has to be the but-for cause of the sexual conduct. That's not what the statute would say even if Burrage did apply. If Burrage applied and you replaced for the purpose of with resulting in, it would be, again, that the explicit conduct resulted in a visual depiction. Obviously, the sexual conduct is the but-for cause of the visual depiction. But in any case, as we've argued, this was harmless. Even assuming defendant's logic, that with respect to each particular instance of sexually explicit conduct, some of the pictures at issue, for instance, were just lascivious displays of the victim's genitalia. And so that's what seems to me is the case. Obviously, it was the but-for cause of that conduct itself was the desire to take the picture. But again, that's not even what the statute would say if defendant were right, and there is no doubt that that was overwhelmingly supported by the defendant. Sotomayor, I have another question. Were Burrage, I mean, here the instruction was in the words of the statute. Correct. Does Burrage say in that line of cases that you have to instruct in other than the words of the statute? I don't know the answer to that question, Your Honor. I would say that here the model instruction is identical to what was provided here. So it's not just the words of the statute that there was a model instruction in play. That, at minimum, underscores the lack of any plan error. Well, we don't – I mean, you know we disapprove of those sometimes. But here it seems to me it's really more a question of whether you had to say more than what was in the statute. At minimum, I would say there was no case that holds that, and the absence of such a case in this context itself demonstrates any lack of plan instructional error. And if the Court has no further questions, I will submit. Thank you very much. Thank you. I'm going to try to make six quick points, if I may. Just at the outset, the government limits, just like they did in their brief original argument, to whether it's an abuse of discretion not to apply – not to appoint substitute counsel. We've raised a Sixth Amendment claim that he was denied counsel in part because of the irreconcilable conflict on the record and the lack of communications. That's a constitutional claim that's reviewed de novo. Well, but that's true in all of these cases. No, some are – they're not raised – some are just raised as you didn't substitute my counsel, and that's the only claim that's raised. We're saying here the extent of the conflict and the extent of noncommunications rise to the level of actually denying counsel. But if he didn't err on – if there was no abuse of discretion and no error on any individual choice, you're just sort of arguing that atmospherically, collectively, it rises to the Sixth Amendment. Over the course of the – from at least October 2011 to October 13, 2013. But how could that be if there's no – He didn't have any counsel. If there's no error on any individual decision, how can it be that collectively they become worse? I don't have an answer, but since I only have two minutes, I'm going to leave that philosophical question for another day. Acting unreasonably. She says – my opponent says that the conflict between lawyers is irrelevant. I disagree. Stanley Retschko had cause to complain. He had lawyers on the record accusing him of abandonment. The lawyers had, in fact, abandoned him. They were accusing each other of malfeasance. Those are reasons to question your counsel. Those are bona fide reasons whether you're a mental case or not. You still haven't answered my question. What didn't the lawyers do that prejudiced? I think your answer – I don't have to show prejudice. Isn't that what you're saying? According to Lisa Basis and Backman, neither one worked on the case for over a year, and they abandoned the client. They did nothing. They ignored him. But what would they have done? Prepared a defense, met with him, understood what he said in his letters. Was this the period that he was – that the competency hearings were going on? What? Was this during the period that the competency hearings were going on? When this raised its head, that's how they got out of it. They – Mr. Retschko moved to – I think he moved ten times for counsel. The other ones each moved five times to be relieved. In the October 11 timeframe, he asked them to be substituted out, and as opposed to answering that question, they had him shrunk. So they ordered him to a competency examination for raising bona fide questions about his lawyer's conduct. But the period that you're pointing to, which I'd have to go back and look at more carefully, was that a period during which competency hearings were going on? They went off and on during this entire period. During the period that you're talking about? Yes, in part. For portions of those periods. Three, the last one, the government says, regarding the reappointment issue, that his goal was a trial continuance. That is not true. The record doesn't bear that out. He wanted to – But that's what the district court specifically found. Right. No, he found that – He was engaging in these actions in order to delay the trial. Well, that's clearly erroneous because he said he wanted Kalianides appointed in December to go to trial in February. He did say that. And Kalianides said, I'm not ready. He didn't ask. Retzko didn't in December say, I want Kalianides and let's go in June. He said, I want Kalianides, let's go now. That's the opposite of asking for a continuance. Retzko didn't ask for a continuance. Kalianides did. While he wasn't representing him. That was the lawyer saying, I can come in only if you do it my way. The client said, bring him in now. I thought Kalianides had a couple of other trials, one of which was a very lengthy trial set for that same period of time. I don't believe so. I believe the December 14th meeting date was – He had a very short one right afterwards and he had a much longer one, but after this trial would have been over. That is correct. He said he couldn't go because he couldn't file pretrial motions and motion to eliminate. That was his only reasons. Those were not good reasons. And the court could have accommodated his reasons by saying do oral motions only or motion to eliminate would be heard on a different schedule. That wasn't a reason to deny Retzko's request. Retzko did not ask for a trial continuance. Full stop. He did not do that. It wasn't a proper basis to deny his request for a lawyer. All right. So suppose we thought this was a problem. What kind of a problem is it? Is that a Sixth Amendment problem? Yeah. It's a Sixth Amendment problem. All Retzko ever wanted was some lawyer to actually listen to him. Read the letters I gave you at the site. I've been with this guy for two and a half years. Two and a half years is a long time. You haven't heard of Pete. And that doesn't mean he's not a challenging client. It doesn't mean his problems have gone away. It means listening to a challenged client. You know, the constitutional obligations they give your honors and give my opponent and give me to participate in these cases is extraordinary. And sometimes you get clients that are hard. You get defendants that are hard. And that's when you raise your game and you meet the person in front of you and you don't fight back and say, I'm going to piss in the wind. Of course, Judge. Judge, King's problem is that he thought he had given him a terrific lawyer. Backman? Yes. Well, then you've got to. That's outlandish. Well, he went on about how he got to acquittals. He did death penalties. He's done all kinds of stuff. Look at this. Compare the letters. He gave them to you. That was a violation of his oath of office. It gave Retsko cause to complain. But now they're here. So we can't ignore evidence. Right? This isn't a Fourth Amendment case. Read them. Retsko's the guy who's reasonable. Backman's the guy who's. Counsel, this is a very, very difficult case to defend against given the facts. Well, at the same time, let's see. And this will go to the barrage question. Stanley Retsko believed when he got married in a Philippine courthouse with the. . . To a 15-year-old girl? She was 16 years old at the time. He believed she was 18. There's a reasonable age of defense. Her parents were there. He got married. He took photographs of his wife in a marital bed. And he thought there was a problem with giving him life for that. I don't. . . Maybe the statute says something otherwise. We'll get to barrage in a second. But you might imagine that someone who has a wedding in a courthouse before a judge. . . With the wife's parents there and then moves into an apartment next door. . . Might think it's okay to photograph his wife in a marital bed. Is there. . . You might think. . . You might understand that problem. I'm going to cut you off in a minute. But there's one thing that I've wondered about the merits of this case. Is the point that in the Philippines, even with parental consent, you can't get married if you're under 18? That's correct. Twelve is the age of consent. Eighteen is the age of marriage. No matter. . . Or without parental consent. With parental consent, you can go. . . No, I think it's 18 even with parental consent. It must be or otherwise there would be no issue here. All right. Can I say one thing about barrage? Well, very, very fast. We don't substitute the results of. What barrage holds is language like because of results of means but for causation. Yes, but the problem that your opponent pointed to is the one that. . . Which is that in this instance, some of those photos were just of her. . . Yeah. You know, sexual. . . I understand that. All right. And fit within the statute no matter what the statute means. Oh, I would disagree. Did he entice her to have sex when those pictures were taken for the purpose of the pictures and for the purpose of sex? But she wasn't having sex in those pictures. No, but the pictures were incidental to sexual congress. They were incidental, so that's not for the purpose of. . . No. It's the motivating factor. And you're right about the mixed motive cases. And you're right that unless congress spells out mixed motives. . . But. . . And that's what we've had. . . Another thing is that the statute. . . The instruction was in the words of the statute. Was that true in barrage or however one says that case? Barrage. Barrage. Barrage. I don't believe so, but I'm not. . . So, I mean, that's what seems to me to be the problem here. I mean, it's. . . There was no objection as I understand it. Explain that review. The statute. . . The instructions were in the words of the statute. How could that be a wrong instruction? Because they didn't give the finding that they had. . . The jury didn't have to find for the purpose of language. They didn't have to find causation and Miller. . . Well, it had to find whatever. . . Whatever for the purpose of men. That's what it had to find. They needed an instruction on it. That's the. . . Well, that's what I'm asking. Why did they need an instruction? Anyway. . . Thank you. Thank you very much. Your time is up. Thank you. Thank both of you for useful arguments in a very hard case. And United States v. Resco is submitted.
judges: Berzon, Tallman, Nelson